24CA1841 Peo v Nieto 07-16-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1841
Alamosa County District Court No. 23CR308
Honorable Crista Newmyer-Olsen, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Angel Nieto,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE FREYRE
Kuhn and Taubman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 16, 2026

---

Philip J. Weiser, Attorney General, Rachel Lieb, Assistant Attorney General II, Denver, Colorado, for Plaintiff-Appellee

Antony Noble, Alternate Defense Counsel, Bryan Collins, Alternate Defense Counsel, Lakewood, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Defendant, Angel Nieto, appeals his escape convictions, alleging that the trial court erroneously denied his constitutional right to be present at trial and his motion to terminate counsel. We disagree and affirm the judgment.

## I.     Background

¶ 2     Nieto, a parolee, was arrested by his parole officer on an outstanding arrest warrant. Nieto asked if he could see his mother, who was a few houses away, before he was taken into custody. The officer handcuffed Nieto behind his back and placed Nieto in the patrol car. The officer then went to the mother's home. When Nieto's mother answered the door, the car alarm went off, and the officer saw Nieto running down the street. He called dispatch to report Nieto's escape. After a short search, police officers found Nieto hiding in a backyard shed and arrested him. The prosecution charged Nieto with two counts of escape. Nieto attended all pretrial hearings and participated in the jury selection process on the first day of the trial. However, as described further below, he did not return to court for the remainder of the trial, and the jury convicted him as charged.

## II.     Right to be Present

¶ 3     Nieto contends that the trial court erred in finding that he voluntarily absented himself from the trial and argues that his lack of medication rendered his suicide attempts involuntary acts.  We are not persuaded.

### A.     Additional Facts

¶ 4     On the first day of trial, Nieto appeared with his attorney and participated in jury selection.  During the lunch break, Nieto spoke with his attorney and returned to his holding cell.  Nieto then began screaming.  When deputies arrived, Nieto "shoved his tie knot all the way up around to his neck, pulling on it real hard, wrapped it around his neck and then covered his neck with his hands so [the deputies] could not get to it."  Deputies intervened and transferred Nieto to the hospital, where he was cleared medically and psychologically later that night.  He was sent back to the jail and placed on "precautions for suicidal ideations."

¶ 5     The trial court received emails and heard testimony from several deputies who said that they believed Nieto had faked his mental health crisis.  Deputy John Gonzales, who witnessed Nieto's

2

attempt to self-harm on camera, was questioned by the prosecutor

in the following colloquy:

> Q: And you didn't notice anything about Mr.
> Nieto at all —
>
> A: No. I was with him all morning and —
>
> Q: Okay. Well, I mean at this point, did you
> notice — did you see the occurrence or
> anything afterwards —
>
> A: Yes.
>
> Q: You were able to observe him?
>
> A: Yeah.
>
> Q: Okay. Did you observe anything about his
> demeanor?
>
> A: From my — to me, I was — I don't how to
> put it politically, but I've done this a long time.
> I didn't feel that it was — I felt it was an act.
> And —
>
> Q: Okay. Tell us why.
>
> A: Just because I've seen it a million times and
> he was responding to pain stimulus. [Another
> deputy] was giving him a sternal rub, and he
> would respond to that.
>
> Q: Tell us about that. What does that mean?
>
> A: It's, like, something that paramedics and
> people do, just a sternal rub to see if they're
> responsive for pain, like — just like an
> ammonia inhalant. You can't not react to it.

Q: Okay. And he reacted to it?

A: Yes.

Q: Okay. Thank you.

¶ 6    The trial court talked with counsel about how to proceed and then released the jury for the day with instructions that the trial would continue the following morning.

¶ 7    The next morning, Nieto refused to go to court and told the deputies that he didn't feel well and that he didn't want to be around anyone. Nieto then appeared via WebEx and the following colloquy occurred.

> [THE COURT]: All right. So Mr. Nieto, I have been informed this morning that you are not interested in coming to court today. Is that — tell me what your thoughts are about coming to court.
>
> [NIETO]: I just feel like killing myself. I don't feel like — I'm real depressed. I just — I don't know what's going on with me. I been hearing a lot of voices. I think I need to see a doctor.
>
> I woke up in the hospital with vital signs all over me. I got in an argument.
>
> [COURT]: So, Mr. Nieto, the likelihood is that this trial is going to proceed today with or without you; do you understand that?

4

[NIETO]: I understand. I understand I'm not going to be there. I don't feel — I want to fire my lawyer, for sure. He's the devil.

[COURT]: Well, so you understand that if you're not here, the jury — I plan to instruct the jury they are not to infer anything by you not being here, but they're certainly going to know that you're not here. Do you understand that?

[NIETO]: Yeah, let them know that I — I don't even know what's going on today. I don't even know what day it is.

[COURT]: Right.

[NIETO]: I just know I woke up in the infirmary, and I know that they keep bothering me. There is blood all over me. I know that they killed my sister here.

I just don't think that I'm competent. I'm not going to trial. I want to see a doctor. And if my lawyer wants to pursue the issue — because the way Alamosa is, is that they're going to keep — try rush everything through and forcing me to go to trial. I ain't never [sic] — I didn't even know today was the trial.

You know, I woke up in the hospital. I don't know — I want to fire my lawyer. That's it. He's not my lawyer. He's not helping me. He's not communicating with me.

I have — I don't feel good. I need to go to the doctor. They haven't given me my meds in five days. I'm on psych meds, Zoloft and all kinds of crap, and they haven't given me my medicine in five days.

5

So you're not supposed to cut somebody off their psych meds. They cut me off my psych meds. And I just know that everybody is a devil.

[COURT]: So, Mr. Nieto, my understanding is you told your lawyer yesterday that you didn't want to go to trial yesterday, that you —

[NIETO]: I told him that since the day before yesterday.

¶ 8 Nieto then told the court he had not been present for jury selection and did not have any clothes to wear to trial. The court reminded Nieto that he had been present for jury selection, and his counsel confirmed he dropped off clothes for Nieto the day before and that morning.

¶ 9 As to Nieto's refusal to participate, the trial court found, "[H]e's been cleared mentally to be held. No one has filed an M-1 against him — or on him,"[1] but he "clearly does not — want to come to

---

[1] In Colorado, an "M-1 hold" is a legal order allowing medical and mental health professionals to intervene if the individual appears to have a mental health disorder and presents an "imminent danger to themselves or others." Colo. Off. of Behav. Health, Colo. Dep't of Hum. Servs., *Involuntary Mental Health Treatment* (2026), https://perma.cc/Q2Y8-B397.

court today and is refusing to come to court today." The court continued:

> We started the trial yesterday. I think that the provisions of [Crim. P.] 43 come into play. . . .
>
> [T]he Court may complete the trial under [Rule] 43(b) and the defendant shall be considered to have waived his right to be present whenever a defendant initially present, one, voluntarily absences himself after the trial has commenced, whether or not he's been informed by the Court of his obligation to remain during trial.

¶ 10    The trial court further explained its findings:

> Mr. Nieto had stated this morning that he felt he was not competent to proceed. The Court's take on all of that is that Mr. Nieto is desperately trying to get out of the trial rather than he's not competent, and I will so find based on my observations of him, based on his behavior yesterday in court, based on his statements this morning.
>
> I don't think there is enough information to ask for a competency evaluation and to proceed down that trail so I will not.
>
> I will find that Mr. Nieto has voluntarily waived his right to be present at trial, that the waiver is in fact knowing, voluntary, and intelligent, and we will proceed this morning.

¶ 11    After the trial court made its findings, it gave Nieto another chance to come to court, and Nieto said that he wished to come,

although he was not sure he could make it out of his cell and wanted to see a doctor. The trial court told Nieto to be ready to proceed at 10 a.m. When the trial resumed, Nieto had not left the jail. Another jailhouse deputy testified that Nieto attempted self-harm again, just before he had to leave for court. The trial court stated, "I still think we're still under Rule 43 and the *Price* case, and the indications continue [that Neito] has caused — has taken the action that causes him to be absent from court, and we will proceed without him." Defense counsel renewed his objection to continuing trial without Neito present.

¶ 12     After conferring with counsel, the court instructed the jury as follows:

> You may notice that Mr. Nieto is not here this morning. Let me tell you that you are not to use that fact in any way. That is not evidence of anything.
>
> It is not to be construed against him. You are to draw no inferences as a result of his absence. The fact that he's not here is — you may hear with other things that occur in Court — is not evidence. It's not something for you to consider in this case.

8

## B. Standard of Review and Applicable Law

¶ 13    A defendant has a constitutional right to be present during trial. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16; *People v. Janis*, 2018 CO 89, ¶ 16. However, the right to be present is not absolute and may be waived. *Id.* at ¶ 17. A defendant may waive the right to be present either expressly or through conduct, including through voluntary absence after the trial has commenced in the defendant's presence. *People v. Daley*, 2021 COA 85, ¶ 28.

¶ 14    As relevant here, Crim. P. 43(b)(1) provides:

> The trial court in its discretion may complete the trial, and the defendant shall be considered to have waived his right to be present, whenever a defendant, initially present:
>
> (1) Voluntarily absents himself after the trial has commenced, whether or not he has been informed by the court of his obligation to remain during the trial . . . .

¶ 15    "The purpose of this principle is to prevent a defendant from frustrating a trial in progress by his own conduct." *People v. Price*, 240 P.3d 557, 560 (Colo. App. 2010). Whether a defendant's absence is voluntary may be inferred from the circumstances. *People v. Burnell*, 2019 COA 142, ¶ 16. Moreover, a defendant's

9

absence may be deemed voluntary when he creates a medical necessity to cause his absence from trial. *Price*, 240 P.3d at 560-61; *see People v. Stephenson*, 165 P.3d 860, 868-70 (Colo. App. 2007). Determining whether a defendant is "voluntarily absent" requires a fact-specific inquiry into the medical condition and the circumstances surrounding his absence, including the defendant's conduct and statements. *Id.* at 870. "[T]he preferred method of establishing a waiver [of appearance] is through colloquy with the defendant . . . ." *Price*, 240 P.3d at 560. "An absence is voluntary if the defendant knows that the proceedings are taking place and does not attend." *Stephenson*, 165 P.3d at 869.

¶ 16    Whether a waiver of the defendant's constitutional right to be present was valid presents a mixed question of fact and law. *Price*, 240 P.3d at 560. We review the court's factual findings for clear error, and we defer to those findings if there is any record support for them. *Daley*, ¶ 26. We review de novo the question of whether the court violated a defendant's constitutional right to be present. *Zoll v. People*, 2018 CO 70, ¶ 15. When a trial court proceeds with the trial despite a defendant's absence, we review that decision for an abuse of discretion. *People v. Trefethen*, 751 P.2d 657, 658

10

(Colo. App. 1987).  A court abuses its discretion when it misapplies the law or when its ruling is manifestly arbitrary, unreasonable, or unfair.  *People v. Vanderpauye*, 2023 CO 42, ¶ 23.

¶ 17    We review preserved constitutional errors for constitutional harmless error, reversing if "there is a reasonable possibility that the [error] might have contributed to the conviction."  *People v. Aldridge*, 2018 COA 131, ¶ 19 (quoting *Hagos v. People*, 2012 CO 63, ¶ 11).  "The People bear the burden of proving that the error was harmless beyond a reasonable doubt."  *Id.*

## C.    Analysis

¶ 18    We discern no error in the trial court's conclusion that Nieto voluntarily waived his right to be present and, thus, no abuse of discretion in its decision to proceed with the trial in his absence, for three reasons.

¶ 19    First, before the trial began, the record shows that Nieto attended all court appearances with counsel and gave no indication of any mental health concerns.  Indeed, the record contains no evidence to support Nieto's claim that, before the start of trial, jail personnel had suddenly ceased giving him his prescribed mental health medications five days earlier.

11

¶ 20    Second, the record shows that the court conducted the requisite fact-specific inquiry and supports the court's finding that Nieto created the medical necessity that caused his absence from the trial.  It shows that Nieto waited until the deputies entered the holding cell to tie the knot around his neck that resulted in his transport to the hospital.  Thereafter, the court questioned the deputies involved in the incident about their observations and opinions; it learned that doctors had medically and psychologically cleared Nieto and that Nieto had been returned to the jail without any type of mental health hold.

¶ 21    Third, the court questioned Nieto directly the next day after receiving information from the deputies that Nieto was refusing to come to court, said he was not going anywhere, and wished to go to a mental hospital.  While Nieto contends that his statements to the deputies and the court reflected his mental health deterioration and his lack of access to medications, thereby rendering his suicide attempts involuntary, the record shows otherwise.  Nieto said he understood that the trial would proceed in his absence and that the jury would be instructed not to consider his absence in its deliberations.  Despite Nieto's assertion that he was not competent

12

and had not received his medications for five days, defense counsel never moved to determine Neito's competency. And he does not identify any record evidence showing that he did not understand the nature of the proceedings or could not assist counsel in his defense. *See* § 16-8.5-101(12), C.R.S. 2025 (A defendant is incompetent to proceed if, "as a result of a mental disability or developmental disability," he lacks "sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding in order to assist in the defense," or he "does not have a rational and factual understanding of the criminal proceedings."). Moreover, other than Nieto's own statements, nothing in the record shows that Nieto was not given his psychiatric medications or that he had stopped taking them. The court rejected Nieto's contention that he was incompetent based upon its observations of him, his behavior, and his statements. *See People v. Morino*, 743 P.2d 49, 52 (Colo App. 1987) (a trial judge who had the opportunity to observe the defendant, his actions, and general demeanor, has substantial discretion to determine whether an issue regarding his competency has been raised).

¶ 22    After finding that Nieto had voluntarily waived his right to be present, the court gave Nieto another chance to come to court. Nieto said he would be present, but he never appeared.

¶ 23    Because the trial court conducted a proper inquiry into the facts surrounding Nieto's suicide attempts and because its findings are supported by the record, we agree that Nieto voluntarily waived his right to be present at his trial. *See People v. Perea*, 74 P.3d 326, 331 (Colo. App. 2002).

¶ 24    We reject Nieto's argument that the court misapplied *Price* and instead conclude that *Price* supports our conclusion. In *Price*, the defendant attempted suicide midtrial by cutting his wrists and throat, which required his hospitalization. *Id.* at 561. The defendant left a note that said, "I cannot live with the crap trial that I am going through in Douglas County. It's all lies and coached by the D.A.'s office." *Id.* In holding that the defendant was voluntarily absent, a division of this court reasoned that the defendant "was aware his trial was taking place by attending the first day. His suicide note . . . reflected both that he understood the proceedings against him and that he purposefully determined to absent himself from the trial." *Id.*

14

¶ 25    As in *Price*, Nieto attended and participated in jury selection on the morning of the first day of trial and then voluntarily absented himself from the proceeding when he attempted suicide over the lunch break.  He told the court he understood he had a right to be present and that the trial would proceed in his absence.  Therefore, the record shows that the trial court did not abuse its discretion when it found that Nieto had waived his right to be present.  *See Price*, 240 P.3d at 561-63; *see also Daley*, ¶ 35 (affirming trial court's finding of voluntary absence when the defendant attempted suicide); *United States v. Yannai*, 791 F.3d 226, 244-45 (2d Cir. 2015) (defendant who overdosed on pills found to be voluntarily absent from trial); *United States v. Crites*, 176 F.3d 1096, 1098 (8th Cir. 1999) (defendant's attempted suicide rendered him voluntarily absent from trial).

¶ 26    We are also not persuaded that *United States v. Latham*, 874 F.2d 852, 858 (1st Cir. 1989), requires a different result.  There, the defendant ingested cocaine to calm himself, which ultimately required his hospitalization, although he stated he was not attempting suicide.  *Id.*  The court found that simply taking drugs did not render his absence from trial voluntary.  *Id.*  In contrast, in

this case, Nieto told the deputies (and inconsistently the court) that he was not coming to court, wanted to go to a mental hospital, and was trying to kill himself.

¶ 27    Relatedly, Nieto asks us to take judicial notice "of the undisputed scientific fact that the sudden cessation of antipsychotic medication can have an adverse effect on a patient, up to and including the rapid onset or relapse of psychotic symptoms."

¶ 28    We note that as a threshold matter, Nieto did not make this request in the trial court.  Regardless, even if this fact is the type of adjudicative fact "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," CRE 201(b), we are not convinced that it would affect the outcome here.  Nothing in the record shows that Nieto suffered from a psychotic disorder, that he was prescribed an antipsychotic medication, or that he had been prescribed medication for psychosis.  So even if we take judicial notice of the fact that abruptly discontinuing an antipsychotic medication can cause a

16

psychotic episode, nothing in the record connects Neito's circumstances to that fact pattern.

¶ 29    Accordingly, we discern no violation of Nieto's constitutional right to be present.

### III.    Waiver of Counsel

¶ 30    Nieto contends that the trial court erroneously denied his request to terminate counsel and proceed pro se. We disagree.

### A.    Additional Facts

¶ 31    Early in the case, Nieto and his counsel disagreed about whether he should waive his preliminary hearing. Defense counsel explained that they had talked at length about his preliminary hearing waiver in one of Nieto's other cases and that Nieto was now suggesting that counsel had lied. Based on these concerns, counsel moved to withdraw. The trial court found no basis to allow defense counsel to withdraw and denied the motion. Nothing in the record shows any conflict existed between Nieto and his counsel until after the jury selection in this case and Nieto's suicide attempts.

¶ 32    When the trial court told Nieto the trial would proceed without him, Nieto asked to proceed pro se. Nieto alleged that his attorney was friends with the prosecutor based on a comment made by a

17

prospective juror that he had worked with both the prosecutor and Nieto's defense counsel before. He said:

> The DA and [my attorney] are best friends. That's a conflict of interest right now, even if we want to go to trial. They're friends. You heard the lady say that. They're all friends. That's a conflict of interest. How can my lawyer be best friends with the DA?

¶ 33 After the court questioned Nieto regarding his presence at trial, Nieto asked to speak with his lawyer before the trial reconvened. ("I want to talk to my lawyer. Lawyer, can you come get me?"). Because the trial break was scheduled to end at 10:00 a.m., the court told Nieto he could speak to his lawyer if he arrived before then.

¶ 34 Counsel then moved to withdraw, stating, "[Nieto has] indicated he wants to fire me, quote, his language, fire me." The following colloquy occurred:

> [COURT]: So, Mr. Nieto, the — you made that statement. What is your preference in terms of proceeding with or without [counsel], understanding that if [counsel] is allowed to withdraw, I will take that as a waiver of your right to counsel at all.
>
> [NIETO]: Me and my lawyer have no communication. When he first — when he came in it's on the record that he did want to

18

withdraw from my case from the beginning.  So he's been wanting to withdraw from my case from the beginning, so I'm just letting him — I been knowing that he hasn't been helping me —

[COURT]: Here [are] the choices for you, Mr. Nieto.  You can either proceed with [present counsel] as your attorney and have him proceed with the trial or you can proceed to trial without an attorney.  Those are your two choices today.

[NIETO]: That's fine.

[COURT]: Which one do you want, which one?

[NIETO]: I want to fire my lawyer, that's what I want.

[COURT]: So you're going to come to court and represent yourself?

[NIETO]: Yes.

[COURT]: You understand that if you represent yourself, you're going to be held to the same standard as if you were a lawyer?  In other words, you're going to need to know what the rules of procedure and the rules of evidence are and you're going to be proceeding at your own peril, so to speak, by representing yourself.  Do you understand that?

[NIETO]: — makes you happy at the end of the day, okay sir.  Whatever you're trying to satisfy, I hope your dream comes true today. Going to be my life in a casket because you don't care about —

19

[COURT]: Mr. Nieto — Mr. Nieto, I need an answer about whether you want to fire your attorney or not.

[NIETO]: Yes, I do. I been trying to fire him. Yes, I do.

[COURT]: You understand that if you do that, you'll proceed to trial today without an attorney? Do you understand that?

[NIETO]: I'm not saying nothing. My Fifth Amendment.

[COURT]: This is not a Fifth Amendment question sir.

[NIETO]: Well it is to me. I want to be silent right now until I talk to my lawyer and let him know what you're trying to do here.

[COURT]: All right. What I'm going to do is — sorry [counsel], but I'm going to deny your request to withdraw.

B.    Applicable Law and Standard of Review

¶ 35    The Sixth Amendment to the United States Constitution guarantees defendants the right to counsel and implies a right to self-representation. *People v. Lavadie*, 2021 CO 42, ¶ 23. Similarly, the Colorado Constitution provides criminal defendants the "right to appear and defend in person." Colo. Const. art. II, § 16. Because self-representation relinquishes "many of the traditional benefits associated with the right to counsel," *Faretta v.*

20

*California*, 422 U.S. 806, 835 (1975), the right to self-representation is conditioned on a defendant's intelligent understanding of the consequences of proceeding without counsel, *People v. Arguello*, 772 P.2d 87, 92 (Colo. 1989).

¶ 36     A defendant validly waives his right to counsel if he "(1) is competent to waive the right, and (2) makes the waiver voluntarily, knowingly, and intelligently." *People v. Davis*, 2015 CO 36M, ¶ 15. A defendant is competent to waive representation if he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational and factual understanding of the proceedings against him. *Id.* at ¶ 16.

¶ 37     A waiver is voluntary if it is not extracted by threats, violence, promises, or undue influence. *Id.* at ¶ 18. A waiver is knowing and intelligent if the totality of the circumstances shows that the defendant understands the nature of the charges, the possible penalties, the possible defenses, and all other facts essential to a broad understanding of the whole case. *Arguello*, 772 P.2d at 94. Other factors bearing on whether a waiver is knowing and intelligent include "whether the defendant understood the requirement of complying with the rules of procedure at trial,

whether the exchange between the defendant and the judge consisted merely of pro forma answers to pro forma questions, and whether the defendant was attempting to delay or manipulate the proceedings." *Id.* at 94-95. A court "must indulge every reasonable presumption against finding a waiver of the right to counsel." *Lavadie,* ¶ 29.

¶ 38 Whether a defendant validly waived his right to counsel presents a mixed question of law and fact. *Id.* at ¶ 22. We accept the court's factual findings if they are supported by competent evidence in the record, and we review the legal significance of those facts de novo. *Id.* A trial court's denial of the right to self-representation constitutes structural error. *Hagos,* ¶ 10.

## C. Analysis

¶ 39 We discern no error in the court's ruling denying counsel's motion to withdraw. While we agree with Nieto that he clearly and unequivocally expressed his desire to fire counsel, the record demonstrates that he never stated an understanding of the consequences of that decision, and thus, a valid waiver of the right to counsel never occurred. Indeed, the court explained the consequences of proceeding to trial without an attorney and asked

22

Nieto twice whether he understood those consequences. On both occasions, Nieto gave a nonresponsive answer and invoked the Fifth Amendment. Consequently, the record is devoid of any evidence that Nieto voluntarily, knowingly, and intelligently waived his right to counsel. Additionally, when viewed in light of the circumstances surrounding his voluntary absence from the trial, the record supports the court's finding that Nieto was "desperately trying to get out of the trial" and to delay the proceedings. Under these circumstances, we conclude the trial court properly denied counsel's motion to withdraw and Nieto's request to proceed pro se.

## IV. Disposition

¶ 40 The judgment is affirmed.

JUDGE KUHN and JUDGE TAUBMAN concur.